**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CURTIS W GREEN, JR.,

                                CASE NO. 5:21-cv-10680

        *Plaintiff*,          DISTRICT JUDGE JUDITH E. LEVY

*v.*                        MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

      *Defendant.*

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 12, 14)**

## I.    RECOMMENDATION

Considering the entire record in this case, I suggest that substantial evidence does not support the Commissioner of Social Security's determination that Plaintiff, Curtis Green, is not disabled. Accordingly, I recommend **GRANTING** Plaintiff's motion for summary judgment, (ECF No. 12), **DENYING** the Commissioner's motion, (ECF No. 14), and remanding the case under sentence four of Section 405(g).

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff filed an application for supplemental security income ("SSI") on May 14, 2014, alleging that his disability began on December 1, 2002. (ECF No. 9-2, at PageID.50; ECF No. 9-5, at PageID.284.) His claim was initially denied on August 19, 2014. (ECF No. 9-3, at PageID.163.) Plaintiff requested a hearing before an ALJ which was held on December 15, 2015. (ECF No. 9-2, at PageID.82.) The ALJ issued a decision on February

27, 2017, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.* at PageID.63.)  The Appeals Council denied review on December 7, 2017. (*Id.* at PageID.41.)

Plaintiff appealed to the District Court which remanded this matter back to the Commissioner.  (ECF No. 9-14, at PageID.1786; ECF No. 9-15, at PageID.1857.)  After holding another hearing, the ALJ again found that Plaintiff was not disabled.  (ECF No. 9-14, at PageID.1786, 1799.)  The Appeals Council denied review, and Plaintiff appealed the ALJ's decision to this Court.  (*Id.* at PageID.1776; ECF No. 1.)  This case was referred to the undersigned on March 30, 2021.  (ECF No. 2.)  Both parties filed cross-motions for summary judgment and briefing is complete.  (ECF Nos. 12, 14, 15.)

## B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2018).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker*

*v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.   Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are

disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2016); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2016).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2016)).

## D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 9-14, at PageID.1799.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his application date, May 14, 2014. (*Id.* at PageID.1788.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: chronic kidney disease (stage II), degenerative joint disease with partial tears in the shoulders, residual diminished sensation in the upper right extremity secondary to ulnar nerve resection, nonepileptic seizures vs. spells, somatic symptom disorder (persistent and severe), major depression with psychotic features, response bias, and symptom magnification. (*Id.*) At step three, the ALJ decided that none of Plaintiff's severe impairments met or medically equaled a listed impairment. (*Id.* at PageID.1789–91.) Next, the ALJ determined that Plaintiff had a residual functioning capacity to perform light work,[1] except that Plaintiff was limited to:

> only occasional pushing, pulling, and operating foot controls; occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; occasional reaching overhead; frequent handling objects and fingering with the dominant right upper extremity; avoid more than moderate exposure to noise louder than a business office; avoid concentrated exposure to vibration; avoid all exposure to unprotected heights and all use of hazardous moving machinery; no working near open water (e.g. a pool or pond); no swimming alone; no working with sharp objects or near hot stoves or grills; the work is limited to simple, routine, and repetitive tasks performed in a work environment that is free of fast-paced production requirements, involving only simple work-related decisions and routine workplace changes; and only occasional and superficial interaction with the public and coworkers.

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2021).

(ECF No. 9-14, at PageID.1791.)   At step four, the ALJ found that Plaintiff had no past relevant work.  (*Id.* at PageID.1798.)   At step five, the ALJ found that jobs which Plaintiff could perform existed in significant numbers in the national economy.  (*Id.*)

### E.  Background

Plaintiff is a former part-time bus driver who stopped working after a work-related automobile accident in 2000.  (ECF No. 9-2, at PageID.89–90; ECF No. 9-6, PageID.359, 390.)   Because of the accident, Plaintiff developed several physical and psychological impairments that he believes prevent him from working.   Most notably, Plaintiff suffers from depression, psychogenic seizures,[2] and persistent headaches.   (ECF No. 9-14, at PageID.1788.)   He also suffers from chronic kidney disease and partial tears in both shoulders.  (*Id.*)

### 1.  Seizures and Physical Impairments

In December 2013, Plaintiff went to the emergency department after suffering from what he believed to be a seizure.   (ECF No. 9-7, at PageID.438–39.)   Plaintiff told his doctor that he lost consciousness and claimed that he had been suffering from seizures for "years" prior without seeking treatment.  (*Id.*)  However, medical staff could not find any physical signs of a seizure.  (*Id.* at PageID.438–440, 448–49.)   Plaintiff's speech, motor functioning, and thought were intact, and a CT scan of his head revealed no abnormal

---

[2] Psychogenic seizures "look and feel" the same as epileptic seizures, but are caused by abnormally high levels of stress rather than epilepsy.  Jennifer Chen, *Epilepsy or Not? PNES Mistaken for More Common Seizure Disorder*, Yale Medicine (Apr. 3, 2019), www.yalemedicine.org/news/seizure-epilepsy.

findings. (*Id.*) Nonetheless, his doctor prescribed him Keppra, an anti-seizure medication. (ECF No. 9-7, at PageID.449.)

Plaintiff's physicians conducted a follow-up EEG and MRI, but again failed to observe any remarkable findings. (*Id.* at PageID.478.) Based on these results, Plaintiff's physicians concluded that his "seizures" were psychogenic—they arose from psychological, rather than physical, conditions. (*Id.* at PageID.475, 478–79.) Indeed, Plaintiff's neurologist observed him during one of his "seizures" and noted that while Plaintiff displayed "whole body tremulousness," he also "was responsive throughout" and could "answer[] questions appropriately." (*Id.* at PageID.478.)

The following January, Plaintiff met with his neurologist and reported daily headache and muscle pain. (*Id.*) He also reported that his seizures improved to the point where they only occurred once per month. (*Id.*) But a few months later, Plaintiff met with the same neurologist and claimed that although his headaches resolved after taking medication, he now experienced seizures up to two times per week. (ECF No. 9-7, at PageID.476–77.)

A year later, Plaintiff met with his primary care physician, Doctor Kevin Callaway, complaining of neck and back spasms. (*Id.* at PageID.588–89.) Doctor Callaway examined Plaintiff and noted that Plaintiff had knee crepitus and displayed a limited range of motion in his left shoulder, but was otherwise healthy. (*Id.*) These findings were consistent with the results of several examinations Doctor Callaway performed over the last two years. (*Id.* at PageID.482–97, 499.)

Doctor Callaway eventually wrote a medical statement, opining on what he believed were Plaintiff's functional abilities.  (ECF No. 9-8, at PageID.697–700.)  Doctor Callaway opined that Plaintiff could lift less than twenty pounds occasionally and less than ten pounds frequently.  (*Id.* at PageID.697.)  He also opined that Plaintiff could stand for a total of only two hours throughout an eight hour workday, and that Plaintiff needed to freely alternate between sitting and standing.  (*Id.* at PageID.697–98.)  While Doctor Callaway believed that Plaintiff's "handling" and "fingering" were unlimited, he opined that Plaintiff could only occasionally reach in any direction.  (*Id.* at PageID.699.)

Not long after Doctor Callaway wrote this report, Plaintiff met with a state consultative examiner.  (ECF No. 9-12, at PageID.1539–45.)  The examiner observed that Plaintiff displayed normal motor functioning, range of motion, manual dexterity, and coordination.  (*Id.* at PageID.1540.)  Plaintiff could walk independently, squat, and get on and off of the exam table.  (*Id.*)

In June 2016, Plaintiff began occupational therapy after he was bit in his right arm and left hand by a Rottweiler.  (ECF No. 9-9, at PageID.869–75, 888.)  After he was discharged from the hospital, Plaintiff reported decreased strength and sensation in his right hand.  (*Id.* at PageID.896.)  The next month, Plaintiff displayed reduced strength in his right arm, but his arm gradually improved throughout that summer.  (ECF No. 9-12, at PageID.1565–66, 1574–76, 1589, 1596–98, 1610, 1617, 1631; ECF No. 9-13, at PageID.1648, 1657–58, 1664.)

Plaintiff met with Doctor Callaway sporadically until April 2019.  (ECF No. 9-20, at PageID.2122–39.)   After each appointment, Doctor Callaway noted that Plaintiff displayed knee crepitus and a limited range of motion in his left shoulder.  (*Id.*)

### 2.  Mental Impairments

Plaintiff began treatment for his depression and anxiety in January 2014.  (ECF No. 9-7, at PageID.516–29.)  During his intake evaluation, he was "pleasant and cooperative," displayed a logical thought process, and demonstrated "above-average" intellect.  (*Id.* at PageID.521.)  However, he had a "poor" recall of "recent history," and a social worker diagnosed him with major depressive disorder.  (*Id.* at PageID.522.)

Plaintiff met with his psychiatrist, Doctor McAllister, in June.  (*Id.* at PageID.550.)  Doctor McAllister observed that Plaintiff was in a severely depressed mood, and displayed a flat affect, "clutter[ed]" speech, and poor concentration.  (*Id.*)  Still, Plaintiff's thought associations, behavior, and fund of knowledge were normal.  (*Id.*)

Just a couple weeks later, however, Plaintiff's symptoms had improved.  Doctor McAllister noted that Plaintiff's anxiety was now "moderate," and that his speech, thought, judgment, memory, and concentration were all normal.  (*Id.* at PageID.556.)  Doctor McAllister reported similar findings throughout the summer of 2014.  (*Id.* at PageID.567, 573–74, 579–80.)  And by October, Doctor McAllister reported that Plaintiff's anxiety was "mild."  (ECF No. 9-8, at PageID.629.)

In the same report, Doctor McAllister noted that Plaintiff's "attention/concentration" appeared "suspicious delusional [sic]."  (*Id.*)  But like his anxiety, this too improved over time, as Doctor McAllister recorded normal concentration

and cognitive functioning following eight visits between December 2014 and August 2015. (*Id.* at PageID.643, 649-50, 656, 663, 670, 677, 684, 691.)

Despite Plaintiff's recent improvement, Doctor McAllister signed a report, filled out by Debra Simmons, a therapist, noting that Plaintiff had extreme psychological limitations. (*Id.* at PageID.693–94, 731.)  But Miss Simmons did not begin treating Plaintiff until after she filled out this report.  (*See id.* at PageID.694–95, 764–65.)

At an appointment with Doctor McAllister in November 2015, Plaintiff reported decreased concentration, but after examining Plaintiff, Doctor McAllister recorded that Plaintiff's concentration appeared normal.  (*Id.* at PageID.788–89.)

A month later, Plaintiff told Miss Simmons that he heard voices, and at his next meeting with Doctor McAllister, Doctor McAllister noted that Plaintiff's depression had "psychotic features."  (*Id.* at PageID.796, 811.)  However, his objective examination of Plaintiff was normal, and during a later appointment with Miss Simmons, he denied hallucinations.  (*Id.* at PageID.812–13, 828.)  And during an appointment in April 2016, Plaintiff again denied any hallucinations.  (*Id.* at PageID.851.)

A year later, Plaintiff began to show significant improvement at his meetings with Miss Simmons.  In January 2017, for example, Miss Simmons noted that Plaintiff was "smiling and positive."  (ECF No. 9-21, at PageID.2405.)  At their next appointment, Plaintiff displayed an "a sense of humor" and was "smiling."  (*Id.* at PageID.2398.)  He told Mis Simmons that he had been cooking breakfast for his mother every day, helping his daughter with homework, and generally staying "active."  (*Id.*)  Miss Simmons wrote similar notes following her next two meetings with Plaintiff.  (*Id.* at PageID.2371, 2388.)

Her reports following sessions in August and September 2017 also described improvement in Plaintiff's mood.  (ECF No. 9-22, at PageID.2337, 2562.)

### 3.  Plaintiff's Testimony at the 2019 Administrative Hearing

The ALJ began the hearing by examining Plaintiff.  (ECF No. 9-14, at PageID.1816.)  Plaintiff testified that had not worked since the prior decision in 2016.  (*Id.* at PageID.1818.)  He explained that while his physical impairments had remained the same since the prior decision, his mental impairments had regressed.  (*Id.* at PageID.1819–21.)  Specifically, Plaintiff mentioned that his depression had worsened because his best friend recently passed away and both of his parents were ill.  (*Id.* at PageID.1822–23.)

Plaintiff testified that while he lived alone, he neighbored his parents' and siblings' homes.  (*Id.* at PageID.1824–25.)  His daughter often visited him and he would frequently spend time at his wife's home.  (*Id.* at PageID.1825.)  Plaintiff told the ALJ that that he recently went on several trips with his family.  (*Id.*)  For example, his sisters drove him to a funeral in Alabama a few months before the hearing.  (*Id.*)  He also mentioned that he went on a Cruise in Florida with his family and visited a museum in Chicago.  (*Id.* at PageID.1826.)

Once he was done questioning Plaintiff, the ALJ allowed Plaintiff's counsel to examine him.  Plaintiff explained to his attorney that he could no longer take pain medication because it negatively affected his kidney condition.  (*Id.* at PageID.1829.)  As an alternative, Plaintiff used marijuana to manage his pain.  (*Id.* at PageID.1830.)  This, he found, also helped him control his control his anxiety.  (*Id.*)

Plaintiff told his attorney that he sometimes had panic attacks when he went out in public. (*Id.*) He reported that he had been having fewer panic attacks, but that he still stayed at home four days per week. (*Id.* at PageID.1830–31.) On the days he did go out, he would generally only leave his home to visit family. (*Id.* at PageID.1831.) He also reported that he sometimes experienced crying spells and that he had recurring headaches. (*Id.*)

These headaches were associated with his seizures. (*Id.* at PageID.1831–32.) Plaintiff told his attorney that when he was "ready to have a seizure," he would first "get a big bang in the back of [his] head." (*Id.* at PageID.1832.) He clarified that many, but not all, of his headaches were contemporaneous with his seizures, which occurred between two and three times per week. (*Id.*)

Plaintiff's attorney then asked him about some of his physical impairments. (*Id.*) Plaintiff testified that he could not lift either arm above his head because they would "fall[] out of [their] socket." (*Id.* at PagedID.1832–33.) He also reported numbness and tingling in his right hand. (*Id.*) Plaintiff also testified that he could not lift more than ten pounds and that his knees and joints had not improved since 2016. (*Id.* at PageID.1833.)

Plaintiff's counsel finished his examination by asking Plaintiff about his psychological impairments. (*Id.*) Plaintiff shared that he experienced "night terrors," and testified that other people had observed him "just standing in the middle of" his room "at night," although he had no memory of doing this. (*Id.*) During the day, Plaintiff usually would not answer his phone or front door, and he testified that his family did most of his household chores for him. (*Id.* at PageID.1834–35.)

### 4.  The VE's Testimony at the Administrative Hearing

After Plaintiff testified, the ALJ questioned the vocational expert ("VE").  (*Id.* at PageID.1838.)  The ALJ told the VE that he would assume all of her testimony was consistent with the Dictionary of Occupational Titles ("DOT") unless she told him otherwise.  (*Id.* at PageID.1839.)  He then found that Plaintiff had no past relevant work, and asked the VE whether there were any jobs in the national economy that a hypothetical person of the same age and educational level as Plaintiff could perform, provided that the hypothetical person could only perform light work, except that:

> There could only be occasional pushing and pulling, and operating foot controls; there could only be occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; this individual could never climb ladders, ropes, or scaffolds; they could occasionally perform overhead reaching; they would be able to frequently handle objects, and fingering with the dominant right upper extremity; they would have to avoid more than moderate exposure to noise . . . louder than a business office[;] . . . [t]hey would have to avoid concentrated exposure to vibration[;] . . . {t]hey would have to avoid all exposure to unprotected heights, and they would have to avoid all use of hazardous machinery.  There could be no working near open water, meaning a pool or a pond; there could be no working with sharp objects, or near hot stoves or grills.  This work would be limited to simple, routine, repetitive tasks, performed in a work environment free of fast-paced production requirements; it's involving only simple work-related decisions, and routine workplace changes.  There could only be occasional interaction with public and coworkers.

(*Id.* at PageID.1839–41.)

The VE replied that the hypothetical person could work as an office marker, DOT code 209.587-034, light work, approximately 162,000 jobs, or a mail clerk, DOT code 209.687-026, light work, approximately 40,000 jobs; (*Id.* at PageID.1841–42.)  She clarified that her answer was generally consistent with the DOT, but that she relied on her

"professional experience," when addressing several of the ALJ's functional limitations, including the "occasional overhead reaching," the "handling and fingering" limitations, and the restrictions regarding heights and dangerous machinery.  (*Id.* at PageID.1841.)

The ALJ then asked the VE to consider the individual from the prior hypothetical, but to assume that that person also would be off task for twenty percent of the day, not including scheduled breaks.  (*Id.* at PageID.1842.)  The VE testified that such an individual could not find work because most employers expect their employees to be on task for at least eighty-five percent of the workday.  (*Id.*)

Last, the ALJ asked whether the individual from the first hypothetical could find work if he or she would miss two or more workdays per month.  (*Id.*)  The VE responded that such an individual could not find work because most employers would not tolerate an employee missing more than one workday per month on a "consistent basis."  (*Id.*)

The ALJ then allowed Plaintiff's counsel to examine the VE.  (*Id.* at PageID.1843.) Counsel asked whether the individual from the first hypothetical could find work if "handling, fingering, and reaching was limited to occasional," and the VE responded that such an individual could not find work.  (*Id.*)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability

decision.   42 U.S.C. § 423(d)(5)(B) (2018).   The regulations[3] carve the evidence into categories: "acceptable medical sources" and "other sources."   20 C.F.R. § 404.1513 (2016).   "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. 20 C.F.R. § 404.1513(a) (2016).   "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence.   20 C.F.R. § 404.1513(d) (2016).   Only "acceptable medical sources" can establish the existence of an impairment.   SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*

---

[3] Various amendments have been made to the regulations since Plaintiff filed his claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017.   Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir. 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed his claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same)); *Miller v. Comm'r of Soc. Sec.*, No. 1:17-cv-0718, 2018 WL 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *Rep. & Rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *Rep. & Rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527 (2016).  Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC.  20 C.F.R. § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources.  20 C.F.R. § 404.1527(c).  The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c).  ALJs must also apply those factors to "other source" opinions.  *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544.  The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments.  20 C.F.R. § 404.1527(c)(2).  The ALJ does not owe a treating

16

opinion deference on matters reserved to the Commissioner.  20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a listing, the individual's residua, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination.  20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).  Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion.  *Rogers*, 486 F.3d at 242.  For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in SSR 96-7p, 1996 WL 374186 (July 2, 1996).[4]

---

[4] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission.  *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir.1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply

because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R.§ 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

## G.     Arguments and Analysis

### 1.  Treating Sources

Plaintiff first argues that the ALJ improperly discounted the opinions of three of his treating sources—Doctor Callaway, Doctor McAllister, and Miss Simmons. This, Plaintiff suggests, led the ALJ to err at step three and find an under restrictive RFC at steps four and five.

For applications, like Plaintiff's, that were filed before March 27, 2017, medical opinions from a claimant's treating sources are generally given controlling weight. 20 C.F.R. § 404.1527(c)(2) (2021). However, an ALJ need not give controlling weight to a medical opinion from a treating source if he or she determines that the opinion either (1) is not "well-supported by medically acceptable clinical and laboratory diagnostic

techniques," or (2) is "inconsistent with the other substantial evidence in" the record.  *Id.*

If an ALJ does not give a treating source controlling weight, then he or she must consider the following factors when determining the weight to give the medical opinion: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *accord* 20 C.F.R. § 404.1527(c). An ALJ must provide "good reasons" for the weight assigned to a treating source's medical opinion.  20 C.F.R. § 404.1527(c)(2).

Here, except for the ALJ's decision to depart from Doctor Callaway's opinion that Plaintiff was limited to occasional reaching in all directions, the ALJ generally provided good reasons for discounting Plaintiff's treating physicians.

### a.    Doctor McAllister and Miss Simmons

Plaintiff argues that the ALJ did not provide good reasons for discounting a joint opinion prepared by Plaintiff's psychiatrist, Doctor McAllister, and Plaintiff's therapist, Miss Simmons.  Doctor McAllister and Miss Simmons opined that Plaintiff exhibited "marked" to "extreme" mental limitations caused by Plaintiff's "depression, irritability, mood swings, low frustration tolerance, and anxiety."  (ECF No. 9-8, at PageID.693–94.) In other words, they opined that Plaintiff was incapable, or nearly incapable, of performing "any gainful activity."  *See* 20 C.F.R. § 404.1520a(c)(4) (2021).  Additionally, they claimed that Plaintiff's memory loss and other cognitive deficits prevented him from completing tasks.  (ECF No. 9-8, at PageID.694.)

The ALJ afforded this opinion "little weight," finding that it was inconsistent with Simmons and McAllister's own objective findings.  (ECF No. 9-14, at PageID.1795.)  As the ALJ correctly noted, Plaintiff received Global Assessment of Functioning ("GAF") scores that "generally fell into the range of scores indicative of 'moderate' psychological" limitations.  (*Id.* at PageID.1796; ECF No. 9-7, at PageID.522, 527; ECF No. 9-12, at PageID.1484, 1488.)  A GAF score measures an individual's "psychological, social, and occupational function on a" scale of zero to one hundred.  *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 806 n.1 (6th Cir. 2012).  Although Plaintiff occasionally received GAF scores that indicated serious limitations, the ALJ afforded these scores little weight because other medical findings demonstrated that Plaintiff "consistently showed only moderately severe mood anomalies."  (ECF No. 9-14, at PageID.1795; *e.g.*, ECF No. 9-7, at PageID.126.)  For example, Miss Simmons noted that Plaintiff began to smile and joke at appointments as his treatment progressed, and that Plaintiff reported helping his daughter with homework, cooking breakfast for his mother every day, performing household chores, and was considering returning to work as a rental property manager.  (ECF No. 9-21, at PageID.2371, 2388, 2398, 2405.)  Plaintiff also told Miss Simmons that he planned to go on a cruise with his wife, and over the next three years following Simmons and McAllister's report, Plaintiff went on more than one cruise and took trips to both Florida and Chicago.  (ECF No. 9-8, at PageID.821; ECF No. 9-14, at PageID.1826–29.)  Moreover, throughout Plaintiff's treatment, Doctor McAllister often described his anxiety as "moderate."  (*E.g.*, ECF No. 9-7, at PageID.556, 567, 573–74, 579–80; ECF No. 9-8, at PageID.629.)

Case 5:21-cv-10680-JEL-PTM   ECF No. 16, PageID.2682   Filed 04/21/22   Page 22 of 39

The ALJ also reasonably concluded that Plaintiff displayed only moderate limitations in his cognitive functioning, contrary to Simmons and McAllister's report. To be sure, the ALJ acknowledged evidence that Plaintiff experienced cognitive limitations, but he reasoned that Plaintiff's medical record indicated that his limitations were not as severe as alleged. (*See* ECF No. 9-14, at PageID.1789–90, 1792.) For example, Doctor Kirk Stucky conducted a psychological examination of Plaintiff that revealed a full-scale IQ score of 75. (*Id.* at PageID.1796–97.) But as Doctor Stucky noted, this low IQ score was likely exaggerated. (ECF No. 9-8, at PageID.747.) Indeed, Plaintiff was "noticeably anxious" during testing and displayed "highly improbable inconsistencies in performance during testing." (*Id.*; ECF No. 9-14, at PageID.1796–97.) This led Doctor Stucky to conclude that Plaintiff's IQ score was artificially low and attributed Plaintiff's poor performance to somatization, not cognitive deficiencies. (ECF No. 9-8, at PageID.748–49.) Doctor Stucky's conclusion is consistent with reports from Plaintiff's intake evaluation which noted that while Plaintiff struggled to remember recent history, he displayed above-average intellect and logical thinking. (ECF No. 9-7, at PageID.521.)

In Miss Simmons' treatment notes, she often mentioned that Plaintiff reported difficulty with concentration. (ECF No. 9-8, at PageID.804; ECF No. 9-12, at PageID.1483. But as the Commissioner correctly notes, these symptoms were vague, self-reported, and unbacked by objective findings. (ECF No. 14, PageID.2620.) For example, Plaintiff once reported that he had "memory problems," but Miss Simmons provided no further details to illustrate the extent of these problems. (ECF No. 9-12, at PageID.1483.) Miss Simmons' notes also conflicted with reports from Doctor McAllister, who had a

22

significantly longer treating relationship with Plaintiff.  *See* 20 C.F.R. § 404.1527(c)(2)(i)
(explaining that "the longer a treating source" has treated a claimant, "the more weight"
the ALJ will give to the treating source).  Specifically, Doctor McAllister found that
Plaintiff displayed normal cognitive functioning at eighteen different appointments from
December 2014 through June 2018.  (ECF No. 9-7, at PageID.556; ECF No. 9-8, at
PageID.643, 649–50, 656, 663, 670, 677, 684, 691, 788–89, 812–13, 843, 859; ECF No.
9-21, at PageID.2345, 2380, 2413; ECF No. 9-22, at PageID.2530, 2549.)

Additionally, the ALJ generally noted that Plaintiff's "conservative and routine
treatment" for his psychological impairments undercut Simmons and McAllister's opinion.
*See Gabbard v. Comm'r of Soc. Sec.*, No. 18-cv-13278, 2020 WL 2300237, at *6 (E.D.
Mich. May 8, 2020) (citing *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 808–09
(6th Cir. 2012)) (reasoning that conservative psychological treatment consisting of
medication and occasional therapy indicated that the claimant's psychological impairments
caused relatively few functional limitations).

Based on this evidence, the ALJ reasonably rejected McAllister and Simmons'
opinion that Plaintiff exhibited marked to extreme psychological functioning.
Accordingly, I suggest that this finding is supported by substantial evidence.

### b.    Doctor Callaway

Plaintiff next argues that the ALJ failed to give good reasons for failing to adopt
Doctor Callaway's opinions.  He identifies several aspects of Doctor Callaway's written
opinion that he believes the ALJ improperly discounted, and for the most part, these
arguments lack merit.

The ALJ gave "significant weight" to the opinions in a five-page statement submitted by Plaintiff's treating physician, Doctor Callaway, regarding Plaintiff's functional capacity.  (ECF No. 9-8, PageID.697–700; ECF No. 9-14, PageID.1795.)  However, the ALJ's otherwise favorable treatment of Doctor Callaway's statement came with two explicit caveats.  First, the ALJ disregarded Doctor Callaway's opinion that Plaintiff "remained disabled," reasoning that this was a legal issue reserved to the Commissioner.  (ECF No. 9-14, PageID.1795.)  And second, the ALJ discounted Doctor Callaway's opinions that Plaintiff could stand or walk for only two hours per day and that Plaintiff required the ability to freely alternate between sitting and standing.  (*Id.*)

Plaintiff does not challenge the ALJ's decision to discount Doctor Callaway's opinion that he remained disabled.  Nor could he—a doctor's opinion that a claimant is disabled is not entitled to any deference because this issue is reserved to the Commissioner. 20 C.F.R. § 416.927 (2021); *cf. Frary v. Comm'r of Soc. Sec.*, No. 1:18-cv-1106, 2020 WL 1329330, at *7 (W.D. Mich. Mar. 23, 2020) (holding that a doctor's opinion that a claimant "could not hold down employment" was not "binding on the" ALJ).

Instead, Plaintiff challenges the ALJ's decision to discount Doctor Callaway's postural limitations; however, I suggest that this finding was supported by substantial evidence.  The ALJ explained that these limitations were "not fully supported by the record."  (ECF No. 9-14, PageID.1795.)  Specifically, the ALJ found that there was "no evidence of significant physical postural abnormalities" in Plaintiffs legs that would support such severe restrictions.  (*Id.*)  Indeed, Doctor Callaway consistently noted that Plaintiff displayed a normal gait and posture.  (ECF No. 9-7, at PageID.589, 754; ECF No.

9-20, at PageID.2123, 2127, 2130, 2137, 2141, 2145.)  These findings were consistent with hospital records from Plaintiff's hospitalization following his dog bite which noted that he "was independent with all [activities of daily living] and ambulation."  (ECF No. 9-6, at PageID.346-53.)  Likewise, other physicians observed that Plaintiff displayed a normal gait and generally appeared normal.  (*E.g.*, ECF No. 9-7, at PageID.476–77, 479–80; ECF No. 9-12, at PageID.1540.)

Moreover, while Doctor Callaway prescribed Plaintiff a cane in January 2014, neither Doctor Callaway's medical opinion, nor his notes from his examinations of Plaintiff, mentioned that Plaintiff required a cane.  (*See* ECF No. 9-7, at PageID.483, 487, 490, 493, 496, 499, 589; ECF No. 9-20, at PageID.2029.)  Because the ALJ reasonably found that this aspect of Doctor Callaway's opinion was unsupported by his own notes, and the record as a whole, he properly chose not to give it controlling weight.  *See* 20 C.F.R. § 404.1527(c)(2).

But although these were the only two opinions from Doctor Callaway that the ALJ discussed, they were not the only opinions that the ALJ declined to adopt.  Despite finding that the rest of Doctor Callaway's statement was otherwise well-supported, the ALJ neglected to adopt, or even discuss, Doctor Callaway's opinion that Plaintiff was limited to occasional reaching in all directions.  (*Compare* ECF No. 9-8, at PageID.699, *with* ECF No. 9-14, at PageID.1795.)  Contrary to Doctor Callaway's opinion, the ALJ only limited Plaintiff's overhead reaching, not his reaching in all other directions.  (ECF No. 9-14, at PageID.1791.)

As a preliminary matter, Doctor Callaway's five-page medical source statement is

not a single opinion—it is a document containing several opinions on various aspects of Plaintiff's functional abilities.  SSR 96-5p, 1996 WL 374183, at *4 (July 2, 1996).  *See generally* 20 C.F.R. § 404.1527(a)(1) ("Medical opinions . . . reflect judgments about the nature and severity of [a claimant's] impairment(s). . . .").  The ALJ could not treat the entire medical source statement as noncontrolling simply because a select few opinions within the statement were not well-supported—Doctor Callaway's opinion on Plaintiff's ability to walk says little to nothing about his ability to reach his arms.  *See* SSR 96-5p, 1996 WL 374183, at *4.  Consistent with the Commissioner's regulations, the ALJ must have treated Doctor Callaway's statements on different functional abilities as separate opinions.  *See id.*

The ALJ did not provide good reasons for not treating Doctor Callaway's opinion that Plaintiff could only occasionally reach in all directions as controlling.  The ALJ found that this opinion was "consistent with the . . . treatment record," and still failed to adopt the opinion.  (*See* ECF No. 9-14, at PageID.1791, 1795.)  To state the obvious, the fact that an opinion is consistent with a claimant's treatment record is not a good reason to deny the opinion controlling weight.  *Cf. Tony H. v. Comm'r of Soc. Sec.*, No. 3:20-cv-278, 2022 WL 715737, at *3 (S.D. Ohio Mar. 10, 2022); *Hodgemire v. Comm'r of Soc. Sec.*, No. 1:16-cv-1413, 2018 WL 1516845, at *6 (W.D. Mich. Mar. 28, 2018).[5]

Still, this error alone does not warrant remand.  While "agencies are bound to follow

---

[5] Plaintiff makes a similar argument that despite finding Doctor Callaway's opinion that Plaintiff could lift *less than* twenty pounds to be well-supported, the ALJ found that Plaintiff could lift *no more than* twenty pounds.  And to be fair, Plaintiff is technically correct that the ALJ's finding is less restrictive than Doctor Callaway's opinion.  However, the two findings are only marginally different, and Plaintiff could not have been harmed by such a minor deviation from Doctor Callaway's opinion.

their own regulations," federal courts will not remand a matter to an agency unless "the claimant has been prejudiced on the merits or deprived of substantial rights . . . ." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) (quotation marks omitted) (first quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004); and then quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)). Plaintiff argues that this error was harmful because the VE testified that the jobs she listed for Plaintiff's RFC all "required frequent reaching, handling,[,] and fingering." (ECF No. 12, at PageID.2587 (emphasis removed).)   A finding that he could only occasionally perform any of those activities, Plaintiff argues, would be work preclusive.  (*Id.*)

Plaintiff misrepresents what the VE stated.  At the hearing, Plaintiff's counsel asked the VE whether, in the ALJ's first hypothetical, an additional finding that "handling, fingering, *and* reaching [were] limited to occasional" would "preclude all work."  (ECF No. 9-14, at PageID.1843 (emphasis added).)  In other words, she testified that if Plaintiff could only occasionally perform *all* three activities, then Plaintiff could not find work.  (*Id.*) She made no finding regarding whether any one activity, standing alone, would preclude work if it could only be performed occasionally.[6]  (*See* ECF No. 9-14, at PageID.1843.)

Despite this misunderstanding, however, Plaintiff still demonstrates harmful error. The VE did not address whether occasional reaching in all directions would preclude work, and the Court cannot determine whether the ALJ would still have found that Plaintiff was not disabled absent this error.  (*See id.*)  It is entirely possible that if the ALJ adopted this

---

[6] Doctor Callaway opined Plaintiff had no limitations as to handling or fingering.  (ECF No. 9-8, at PageID.699.)

additional functional limitation, then the VE may have testified that Plaintiff could not find work in the national economy. *Cf. McCauley v. Colvin*, No. 3-15-cv-144, 2016 WL 836689, at *3 (M.D. Fla. Mar. 4, 2016) (reasoning that an ALJ's failure to give proper weight to a medical source was not harmless because the physician "assigned greater restrictions than the RFC, which" if adopted, "could change the outcome of" the case).

Accordingly, I suggest that the Court should remand this matter so that the ALJ can either adopt Doctor Callaway's finding or provide good reasons for why his finding is not entitled to controlling weight.

### 2. Seizures

Plaintiff also argues that the ALJ should have found that he could lift no more than one pound overhead. (ECF No. 12, at PageID.2584.) Because he experienced unpredictable seizures up to three times per week, Plaintiff says that any heavy, overhead lifting presented the risk that he could drop heavy objects on himself if he experienced a seizure. (*Id.* at PageID.2585.) Plaintiff explains that the ALJ's RFC exacerbates this risk by permitting him to lift up to twenty pounds overhead for two hours per day, and up to ten pounds overhead for up to six hours per day. (*Id.*); *see Church v. Saul*, No. 5:20-cv-00081, 2021 WL 2389889, at *2 (W.D.N.C. Apr. 19, 2021) ("The DOT is silent as to whether the lifting is any particular direction . . . ."). Likewise, Plaintiff argues that the ALJ's RFC should have accounted for the fact that his seizures were triggered by exposure to bright lights and that following his seizures, he would need to "rest in a quiet, dark place." (ECF No. 12, at PageID.2587.)

The ALJ does not deny the intensity or frequency of Plaintiff's seizures, nor does

he clearly explain why he believed that Plaintiff could lift up to twenty pounds overhead or why he believed Plaintiff did not need to avoid bright lights. Indeed, the ALJ acknowledges that Plaintiff experienced seizures, and he even included several restrictions in Plaintiff's RFC as "prophylactic measures" to prevent injury from seizures. (ECF No. 9-14, at PageID.1791, 1795.) However, the ALJ does not explain why he thought that certain restrictions, like restricting the use of moving machinery or sharp objects, were necessary, but others, like those Plaintiff suggests, were not. (*See id.* at PageID.1791–98.)

An ALJ could not reasonably find that a person who has random seizures up to three times per week could safely lift twenty pounds overhead for up to ten hours per week. *See* SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Nor could a reasonable mind accept that an individual who is prone to seizures can safely lift ten pounds overhead for up to thirty hours per week. *See id.* at *6. Over time, such an activity would put that individual at a significant risk of injury. Similarly, because the ALJ cites no evidence to undermine Plaintiff's claim that his seizures were triggered by bright lights, he could not reasonably expect Plaintiff to work in an environment where he would be exposed to this trigger. Moreover, the ALJ also cites no evidence to refute Plaintiff's claim that he had to rest after seizures. In fact, the ALJ seems to credit Plaintiff's assertion that his seizures "can account for" his disorientation and "memory loss." (ECF No. 19-4, at PageID.1789, 1792.) The ALJ's findings seem inconsistent with the rest of his decision, which acknowledges that Plaintiff suffers from frequent and uncontrolled seizures. (*See id.* at PageID.1795.)

The only portion of the ALJ's decision which might indicate that he doubted Plaintiff's symptoms were as severe as alleged is a section where the ALJ appears to

suggest that Plaintiff's symptoms were not corroborated by objective medical findings. Specifically, the ALJ noted that not long before submitting his application, Plaintiff "underwent long-term EEG monitoring," but that during this time he did not exhibit "any epileptic activity or seizure-related events that were corroborated by" testing.  (*Id.* at PageID.1793.)  Further, MRI and CT scans of Plaintiff's brain showed "unremarkable" changes to his white matter, and neurological exams conducted during this period were "within normal limits."  (*Id.*)

The ALJ also noted that since Plaintiff's application, "medical staff informed [him] that his condition was consistent with nonepileptic spells," and that his symptoms were caused by psychological, not physical, factors.  (*Id.*)  For that reason, his physicians discontinued his seizure medication, which was only effective in treating epileptic seizures. (*Id.* at PageID.1794.)  During this time, Plaintiff's neurological examinations "were consistently normal," and Plaintiff gave inconsistent reports regarding the frequency of his "spells."  (*Id.*; ECF No. 9-7, at PageID.475.)  Over time, Plaintiff received increasingly less frequent treatment for his seizures.  (*Id.* at PageID.1794.)

Taken as a whole, this discussion simply reasons that Plaintiff's symptoms were psychogenic, rather than physical.  And while it does not appear that the ALJ discounted the severity of Plaintiff's symptoms because the were psychogenic, this would not constitute a valid reason to question the severity of Plaintiff's symptoms.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520a(a), (d) (2021) (explaining that mental impairments may impact an individual's functional abilities).

Other courts have reached similar conclusions.  For example, in *Maples v. Saul*, the

Northern District of Indiana held that an ALJ erred by reasoning that a lack of corroborating objective medical evidence indicated that a claimant overstated the intensity of her psychogenic seizures. *Maples v. Saul*, No. 1:21-cv-157, 2021 WL 1291766, at *3–4 (N.D. Ind. Apr. 7, 2021). In *Maples*, the claimant suffered from psychogenic seizures—events that "resemble[]" seizures, but lack the "physical characteristics" of an ordinary seizure. *Id.* at *3. Although the ALJ recognized that the claimant suffered from these seizures, he dismissed their severity for no reason other than that they were psychogenic. *Id.* The court reversed, explaining that psychogenic seizures were a recognized "psychiatric illness." *Id.* at *3, 6. Because the claimant's seizures were psychogenic, the court reasoned that they were unlikely "to be observed by treating physicians" and would "not show up on EEGs or other objective testing." *Id.* at *4. Thus, the court found that the lack of objective evidence was "consistent with psychogenic seizures," and concluded that the ALJ should have considered the claimant's seizures "as a psychological condition." *Id.*; *see also Salerno v. Astrue*, No. 10-2582, 2011 WL 6318716, at *9–10 (N.D. Ill. Dec. 16, 2011).

Like in *Maples*, the evidence the ALJ relies on here only demonstrates that Plaintiff's seizures were psychogenic, not that they were less intense or persistent than Plaintiff alleged. The ALJ did not suggest that Plaintiff was malingering, and he could not reasonably conclude that because Plaintiff's seizures were psychological in nature, rather than neurological, Plaintiff's symptoms were less severe. *Cf. Maples*, 2021 WL 1291766, at *3–4. Indeed, the cause of his seizures says little about the severity of the seizures themselves, and the ALJ provides no other explanation for why Plaintiff's symptoms might not have been as severe as alleged. *See Salerno*, 2011 WL 6318716, at *9–10.

Thus, nothing in the ALJ's decision challenges Plaintiff's claims regarding the intensity of his seizures.  Yet the ALJ's RFC finding allows Plaintiff to conduct activities that a reasonable person could not expect an individual with Plaintiff's impairments to perform.  Had the ALJ accounted for Plaintiff's light sensitivity, his need to rest after seizures, and his inability to perform overhead lifting in his RFC, then this may have led the VE to testify that Plaintiff could not find work in the national economy.  Accordingly, I suggest that the ALJ's RFC finding is not supported by substantial evidence and the Court should remand so the ALJ can construct an RFC that is consistent with this recommendation.

### 3.  Headaches

Plaintiff also argues that the ALJ should have included restrictions in his RFC to account for his "chronic headaches."  (ECF No. 12, at PageID.2587.)  In support of this argument, Plaintiff cites a collection of medical records which note, in varying levels of detail, that Plaintiff suffers from headaches.  (*Id.*)

But a reasonable mind need not accept that Plaintiff's headaches affected his functional abilities.  As the ALJ noted, Plaintiff reported in May 2014 that his headaches were controlled with medication.  (ECF No. 9-14, at PageID.1794; ECF No. 9-7, at PageID.476–77; ECF No. 9-8, at PageID.718–19.)  Most of the medical records Plaintiff cites predate this report.  (*E.g.*, ECF No. 9-7, at PageID.439–47; ECF No. 9-8, at PageID.704–06; ECF No. 9-20, at PageID.2150.)  And with the exception of one treatment note from February 2016, the few treatment notes which follow the May 2014 report either simply list headaches as part of Plaintiff's medical history or explain that Plaintiff

experienced headaches after neglecting to take medication.  (ECF No. 9-8, at PageID.744–45, 769; ECF No. 9-20, at PageID.2150; ECF No. 9-22, at PageID.2531.)

At most, Plaintiff presents substantial evidence to support a different conclusion, but because a reasonable person could arrive at the same conclusion as the ALJ, the Court must uphold this finding.  *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

### 4.  Concentration

Plaintiff next argues that when considering Plaintiff's "moderate" limitations in "concentration, persistence, and pace" in conjunction with his other impairments, substantial evidence could only support a conclusion that Plaintiff would either be off task for more than fifteen percent of the workday or miss more than two days of work per month—both of which would preclude him from finding work.

In support of this argument, Plaintiff asserts that many courts have held that moderate deficiencies in concentration would equate to a claimant being off task up to twenty percent of the time, which would almost always be work preclusive.  (ECF No. 12, at PageID.2581.)  But in his response brief, Plaintiff walks back this statement, explaining that he only meant to argue that the ALJ did not provide a rationale, backed by substantial evidence, to support his conclusion that Plaintiff would be on task for an acceptable amount of time.  (ECF No. 15, at PageID.2564–65.)

Plaintiff correctly admits that moderate deficiencies in concentration, standing alone, do not render him disabled per se.  Indeed, this view has been adopted by most courts that have addressed this issue.  *See England v. Comm'r of Soc. Sec.*, No. 15-12818, 2016

WL 8114219, at *13 (E.D. Mich. July 11, 2016) (collecting cases). And for good reason. The word "moderate" is "inherently vague" and cannot be stated in terms of a discrete percentage. *Reynolds v. Colvin*, No. 3:13-cv-396, 2014 WL 4184729, at *4 (N.D.N.Y. Aug. 21, 2014). Any attempt to translate the word "moderate" into a quantifiable amount would be nothing more than "rank speculation." *Id.* Although an ALJ who finds moderate limitations in concentration should include some corresponding functional limitations, this finding does not necessarily mean that a claimant will be off task for any particular amount of a workday. *See id.* at *5.

The real issue, then, is whether the ALJ adequately supported and articulated his finding that Plaintiff would not spend an unacceptable amount of time off task.

And I suggest that the ALJ did precisely that. Although the ALJ recognized that Plaintiff's "regular" depression and anxiety could interfere with his focus and attention, he also noted that Plaintiff's "cognitive faculties appeared . . . fully intact." (ECF No. 9-14, at PageID.1789–90.) Indeed, Doctor McAllister noted that Plaintiff's cognitive functioning was normal during eighteen visits through June 2018, and that Plaintiff displayed no "cognitive anomalies during [his] neuropsychological evaluation." (ECF No. 9-7, at PageID.556; ECF No. 9-8, at PageID.643, 649–50, 656, 663, 670, 677, 684, 691, 742–50, 788–89, 812-13, 843, 859; ECF No. 9-14, at PageID.1789–90, 1796–97; ECF No. 9-21, at PageID.2345, 2380, 2413; ECF No. 9-22, at PageID.2530, 2549.)

The ALJ also reasonably found that Plaintiff's anxiety and depression were not as severe as alleged. For example, Plaintiff reported that his anxiety and depression were "stable from treatment." (ECF No. 9-14, at PageID.1794; ECF No. 9-7, at PageID.482–

83, 518–19, 578.)  These reports were corroborated by treatment notes which stated that Plaintiff "obtained significant improvement from therapy."  (ECF No. 9-14, at PageID.1794; ECF No. 9-8, at PageID.623, 629.)  Further, Plaintiff's relationships with others "were generally harmonious," and he often "appeared psychologically normal and pleasant" during therapy.  (ECF No. 9-14, at PageID.1794; ECF No. 9-7, at PageID.549.)

Moreover, the ALJ did not ignore Plaintiff's difficulties with concentration.  Indeed, his RFC accounted for these moderate deficiencies by limiting him to "simple, routine, and repetitive tasks performed in a work environment that is free of fast-paced production requirements." (ECF No. 9-14, at PageID.1791.)  The ALJ also limited Plaintiff to "simple, work-related decisions" and only "routine workplace changes."  (*Id.*)

Plaintiff points to evidence that he believes supports a more restrictive RFC, but because the ALJ reasonably found that Plaintiff could stay on task for an adequate amount of a workday, Plaintiff's argument is no more than a request for the Court to reweigh the evidence.  *See Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982).  Accordingly, I suggest that the ALJ's findings regarding to Plaintiff's time off task are supported by substantial evidence.

### 5.  The Vocational Expert's Testimony

Last, Plaintiff argues that the jobs identified by the VE conflicted with the ALJ's hypothetical RFC because while the ALJ limited Plaintiff to simple and routine work,[7] both

---

[7] The ALJ also found that Plaintiff could only perform "repetitive tasks . . . in a work environment that is free of fast-paced production requirements," and involves "only simple work related decisions and routine workplace changes."  (ECF No. 9-14, at PageID.1791.)

occupations, marker and mail clerk, required a reasoning level of two and three, respectively.  (ECF No. 12, at PageID.2589–90.)

The "reasoning levels" Plaintiff refers to are found in the DOT and describe the general educational background of workers in a particular occupation.  *Givens v. Colvin*, 551 F. App'x 855, 863 (7th Cir. 2013).  A reasoning level of two describes an individual who can "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions, and a reasoning level of three describes an individual who can "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form," and "[d]eal with problems involving several concrete variables in or from standardized situations."  *Dictionary of Occupational Titles* App. C, § III (4th ed. 1991).

"Occupational evidence provided by a VE . . . should," generally, "be consistent with the occupational information supplied by the DOT."  SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000).  But VEs are not bound by the DOT—the DOT's descriptions of occupations "are merely advisory. . . ."  *Wright v. Massaneri*, 321 F.3d 611, 616 (6th Cir. 2003); *Warf v. Shalala*, 844 F. Supp. 285, 289 (W.D. Va. 1994).

Even so, "[w]hen there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . ."  SSR 00-4p, 2000 WL 1898704, at *2; *see also Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 468 (6th Cir. 2017); *Joyce v. Comm'r of Soc. Sec.*, 662 F. App'x 430, 435 (6th Cir. 2016).

Here, the Court need only address whether the VE's testimony conflicted with the

reasoning level for the marker job, not the mail clerk job. The Commissioner can meet its burden at step five if a claimant can perform even a single job that is available in the national economy, provided that a "significant number" of available positions exist for that job. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009). Although the "boundary between a 'significant number' and an insignificant number of jobs" is determined "on a case-by-case basis," courts regularly hold that 2,000 or fewer available jobs are significant. *Id.* (internal quotation marks omitted) (quoting *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)); *see also Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905–06 (6th Cir. 2016). Thus, the 162,000 available marker jobs identified by the VE exist in significant numbers, and the VE's testimony need only be consistent with the level two reasoning level associated with the marker position.

The reasoning level for marker jobs does not conflict with the VE's testimony that they consist of simple and routine work. The DOT's reasoning levels "focus on the worker's educational background, not on the job requirements." *Givens*, 551 F. App'x at 863; *see also Anderson v. Colvin*, 514 F. App'x 756, 763–64 (10th Cir. 2013). Thus, while individuals with lower reasoning levels might generally require greater restrictions, there is no precise correlation between an individual's reasoning level and his or her functional limitations. *See Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000).

For that reason, most courts hold that level two reasoning does not conflict with simple, routine work. *Kozlowski v. Comm'r of Soc. Sec.*, No. 11-cv-12213, 2012 WL 3472354, at *13 (E.D. Mich. Mar. 14, 2012), *report and recommendation adopted by Kozlowski v. Comm'r of Soc. Sec.*, No. 11-12213, 2012 WL 3493036 (2012). While level

two reasoning requires an individual to be capable of carrying out detailed instructions, it also provides these instructions are "uninvolved." *Flaherty v. Halter*, 182 F. Supp. 2d 824, 850–51 (D. Minn. Mar. 29, 2001). This does not require "a high level of reasoning." *Id.*; *see also Stern v. Comm'r of Soc. Sec.*, No. 1:10-cv-1961, 2011 WL 6780889, at *7 (N.D. Ohio Nov. 23, 2011), *report and recommendation adopted by Stern v. Comm'r of Soc. Sec.*, No. 1:10-cv-1961, 2011 WL 6780883 (2011).

Thus, there was no apparent conflict for the ALJ to resolve. Not only was the VE's testimony consistent with the DOT, but the VE also informed the ALJ that all of her testimony at the hearing was consistent with the DOT except where she stated otherwise. (ECF No. 9-14, at PageID.1839.) By not mentioning a conflict, she implicitly testified that the reasoning levels for both positions were consistent with the functional limitations in the ALJ's hypothetical. (*See id.*); *cf. Cooper v. Saul*, No. 20-11855, 2021 WL 4785934, at *8–9 (E.D. Mich. Apr. 16, 2021), *adopted in relevant part by Cooper v. Saul*, No. 20-11855, 2021 WL 3928943 (2021). Accordingly, I suggest that the ALJ did not err by relying on the VE's testimony.

### H.    Conclusion

For these reasons, I conclude that substantial evidence does not support the ALJ's decision. Consequently, I recommend **GRANTING** Plaintiff's Motion, (ECF No. 12), **DENYING** the Commissioner's Motion (ECF No. 14), and remanding the case under sentence four of Section 405(g).

## III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14

days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1) (2018). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: April 21, 2022

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge